UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DXE CORPORATION LIQUIDATING TRUST fka ADVANCED CREATIONS, INC.<br>Attention:  Raymond Wabler<br>51 Medalist Way<br>Beavercreek Township, OH  45385-0016 | ) ) ) ) ) ) ) | CASE NO.<br><br>JUDGE |
| Plaintiff | ) ) ) | |
| vs. | ) ) ) | |
| L3 COMMUNICATIONS CORP.<br>c/o Statutory Agent<br>CT CORPORATION SYSTEM<br>1300 East Ninth Street<br>Cleveland, OH  44114 | ) ) ) ) ) ) ) | **COMPLAINT**<br><br>***[Jury Demand Endorsed Hereon]*** |
| and | ) ) ) | |
| L3 COMMUNICATIONS AVIONICS SYSTEMS, INC.<br>c/o Statutory Agent<br>CT CORPORATION SYSTEM<br>17 South High Street<br>Columbus, OH  43215 | ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |

Now comes Plaintiff, DXE Corporation Liquidating Trust fka Advanced Creations,

Inc. (hereinafter referred to as "Plaintiff" or "DXE"), by and through counsel, and for its

Complaint against the above-named Defendants, L3 Communications Corp., and L3

Communications Avionics Systems, Inc. (hereinafter collectively referred to as "Defendants"), states and avers as follows:

## NATURE OF THE ACTION

This is a civil action brought by Plaintiff DXE against Defendants to recover legal and equitable relief for Defendants' breach of certain provisions of the Asset Purchase Agreement entered into between Advanced Creations, Inc., and BFGoodrich Avionics Systems, Inc., on or around July 28, 2000 (hereinafter referred to as the "APA"), attached as Exhibit A and incorporated by reference.

## PARTIES, JURISDICTION, VENUE, AND CHOICE OF LAW

1.      Advanced Creations, Inc. ("ACi") was a start-up company created by a group of engineers and incorporated in 1988 with the purpose of becoming a world leader in advanced, highly interactive, pilot-friendly avionics systems with the end goal of mitigating pilot-induced errors.   At all times relevant to this action, ACi was incorporated in and existed under the laws of the State of Ohio with its principal place of business in Ohio.

2.      In or around November of 2000, and in accordance with Article 9.6 of the APA, ACi was dissolved with its rights and obligations under the APA assigned to DXE, Corp.  At all times relevant to this action, DXE, Corp. was incorporated in and existed under the laws of the State of Ohio with its principal place of business in Ohio. Thereafter and in accordance with Article 9.6 of the APA, DXE, Corp. was dissolved with all rights and obligations under the APA assigned to DXE.

3.      At all times relevant, BFGoodrich Avionics Systems, Inc. (hereinafter referred to as "BFGoodrich") was duly incorporated by the State of Delaware with its

principal place of business in Grand Rapids, Michigan, and, thus, was a citizen of both Delaware and Michigan.  When the APA was signed, BFGoodrich was a world leader in supplying aircraft safety components, systems, and services to the general aviation market.

4.      Plaintiff is informed and believes and thereon alleges that Defendants purchased all or substantially all of BFGoodrich's assets and liabilities and BFGoodrich assigned all of its rights and obligations under the APA to Defendants.

5.      At all times relevant, Defendant L3 Communications Corp., was duly incorporated by the State of Delaware with its principal place of business in New York, and, thus, was a citizen of both Delaware and New York.

6.      At all times relevant, Defendant L3 Communications Avionics Systems, Inc., was duly incorporated by the State of Delaware with its principle place of business in Michigan, and, thus, was a citizen of both Delaware and Michigan.

7.      Federal subject matter jurisdiction exists in this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and costs.

8.      This Court has personal jurisdiction over the Defendants in this action for a number of reasons, including, but not necessarily limited to, the fact that Defendants maintain a continuous and systematic presence in the State of Ohio; Defendants purposefully availed themselves of the laws of the State of Ohio by distributing, supplying, and/or selling goods into, from, and throughout the State of Ohio such that it is reasonable to anticipate being hauled into court in the State of Ohio; and Defendants

derive a financial benefit from the commercial activities they conduct in the State of Ohio.

9. Venue is proper in this Judicial District, pursuant to 28 U.S.C. § 1391, as a substantial part of the acts and omissions giving rise to the claims set forth in the Complaint occurred in this Judicial District. The APA was entered into in this Judicial District; Plaintiff's performance of the APA occurred in this Judicial District; and Defendants' breach of the APA occurred in this Judicial District. Furthermore, Defendants are corporations subject to personal jurisdiction in this Judicial District and, therefore, reside in this Judicial District.

10. Pursuant to Article 9.3 of the APA, "[t]his Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Ohio, without regard to its conflicts of law doctrine."

## **BACKGROUND**

11. ACi was a start-up company created and assembled by a group of engineers with substantial experience in creating, designing, and developing advanced cockpit technology in the military market. ACi was created with the purpose of becoming a world leader in advanced, highly interactive, pilot-friendly avionics systems by inventing, designing, and engineering advanced technology for the general aviation and entry level business jet markets. ACi's goal was to create avionics systems using advanced technology and designs utilized in the military markets but which were inaccessible to the general aviation and entry level business jet markets.

12. In or around 1989, ACi began developing the concepts for an electronic flight instrumentation system and comprehensive aviation suite that would use global

positioning system technology, a federated and integrated design connecting all technology to a central processing unit, and other technology not utilized in the general aviation and entry level business jet markets to create a "glass cockpit." Where traditional aircraft cockpits rely on numerous mechanical instruments, dials, and gauges, ACi's concept for a "glass cockpit" used only computer monitor displays driven by flight management systems. This would simplify aircraft operation and navigation and enable pilots to focus on the most pertinent information. Accordingly, the cumbersome cockpit configurations of traditional aircrafts would be simplified into organized and pilot-friendly computer screen display formats. ACi's concept also incorporated "synthetic vision" technology, which would provide situational awareness to the pilot by using global positioning system technology to create a realistic three dimensional representation of the aircraft's altitude, flight path, and surrounding topography viewable on a display screen, enabling the pilot to easily and accurately understand the aircraft's navigational position regardless of external light or weather conditions. All of this information would be presented on dual display monitors located within the cockpit.

13. In or around 1996, ACi generated sufficient revenue and capital to identify the system requirements for a comprehensive avionics suite, verify the market demand for such technology in general aviation, and develop the strategic alliances required to implement such a system. Thereafter, ACi developed the Onboard Avionics Synergistic Information System (hereinafter referred to as "OASIS"), an integrated avionics suite that included redundant central computers, dual LCD monitors, inertial data collection,

flight data acquisition and controls, engine data acquisition and control components, all of which operated through a federated architecture deployed throughout the aircraft.

14.     Unlike other general aviation avionics systems being developed at the time, which were single-component systems where each component is restricted to a single function, the OASIS was a fully-integrated digital cockpit, meaning that the avionics system could compute and integrate multiple commands simultaneously and seamlessly.

15.     OASIS was a pilot-oriented electronic flight instrumentation system that monitored and controlled aircraft systems through the integrated "glass cockpit" system. This technology had the ability to revolutionize the general aviation market by replacing numerous mechanical instruments, gauges, and dials with easy-to-use electronic (digital) formats on a shallow menu display inside the cockpit, thus, enabling the pilot to easily see and monitor all of the flight-monitoring data.   Accordingly, this simplifies aircraft operation and navigation and allows pilots to focus only on the most pertinent information.   In addition, its "synthetic vision" technology allowed the pilot to fly the plane and visualize a realistic three-dimensional depiction of the aircraft, flight path, and surrounding topography on a LCD monitor, regardless of external light or weather conditions.   The synthetic vision technology provided situational awareness to the pilot by using terrain, obstacle, and hydrological features (like rivers, lakes, and highways), and other databases.

16.     In or around 1997, ACi also developed "stand-alone" desktop computer-based training and "OASIS embedded" computer-based aviation training technology. The development of the aviation training technology provided OASIS with the unique

capability of incorporating training as an integral component of the avionics.  Student pilots unfamiliar with ACi's advanced technology avionics suite could familiarize themselves with OASIS before ever setting foot in a cockpit.  The computer-based training also permitted pilot recurrency training and equipment familiarization.

17.    In or around 1997, ACi announced it had developed a working prototype of the OASIS electronic flight instrumentation system at the EAA AirVenture Oshkosh Airshow in Oshkosh, Wisconsin.

18.    In or around November 1998, ACi was contracted by Williams International to develop a jet engine test controller.

19.    On or around October 6, 1999, ACi presented the OASIS electronic flight instrumentation system, training technology, and jet engine controller to BFGoodrich. The ACi technology presented to BFGoodrich included, among other notable and unique features:

     i.    Vertical profile view;

    ii.    Moving map display – which is a reasonably large monitor display depicting the location of the moving aircraft on a topographical map;

   iii.    "Highway in the Sky" technology – which enabled the pilot to enter the flight pattern into the system prior to takeoff and generated actual direction for the flight path on the screen complete with symbols guiding the pilot as to not only the direction but altitude to fly – the input of this data generated a "Highway in the Sky," something like a virtual sidewalk.  If the pilot deviated from the

path, he would receive a warning, but if the pilot continued on the
path, he would safely arrive at his destination;

iv.   Synthetic vision technology – a realistic three-dimensional image
of the terrain, aircraft, and flight path displayed in real time
enabling the pilot to visualize the existing topography on a LCD
screen, regardless of external light or weather conditions; and

v.   A "glass cockpit" – the incorporation of all aircraft and engine
function data with simple user interface and shallow menu display,
which included a historical record of readings for up to two hours.

20.   The level of technology utilized in the OASIS electronic flight
instrumentation system was unprecedented in the general aviation and entry level
business jet markets and presented primary flight information, engine monitoring data,
weather, traffic, and terrain avoidance data on LCD multifunction monitors. The only
other systems capable of generating this level of information at the time were
specialized graphic workstations. These graphic workstations, however, were restricted
to computer-generated images, while the OASIS created a synthetic representation of
actual images in real time using global positioning technology and a flyable computer
using new technology 3D graphic display cards.

21.   The OASIS prototype was fully operable, functional, and flyable.
However, the OASIS was an experimental prototype. The OASIS was coded to a
Microsoft-type platform, but the Federal Aviation Administration ("FAA") would not certify
avionics systems coded to a Microsoft-type platform. Accordingly, while the OASIS was
fully operable and capable of flying on an airplane, it was at that time limited to the

experimental aviation market, but would become a commercially viable product upon transition to a FAA-certifiable system.

22.    Because the level of technology utilized by the OASIS electronic flight instrumentation system was unprecedented and was capable of revolutionizing the general aviation and entry level business jet markets, and because ACi had developed a fully-operable prototype, BFGoodrich was interested in acquiring the OASIS flight instrumentation system for its design, technology, and architecture and utilization in future applications.  It was understood by all parties involved that BFGoodrich was acquiring patentable technology and an operable and workable prototype that upon recoding and transitioning, could be FAA certifiable and upon FAA certification, would become a commercially viable product for the general aviation industry.

### *The Asset Purchase Agreement*

23.    On or around July 28, 2000, ACi and BFGoodrich entered into the APA, whereby ACi agreed to sell substantially all of its assets, including the technology, design, and architecture underlying the OASIS electronic flight instrumentation system, and its prototype, the computer-based training system and related technology, as well as the jet engine controller system and related technology to BFGoodrich in exchange for an upfront cash consideration, a series of landmark payments payable upon the occurrence of certain milestone events, a preemptive right of first refusal entitling ACi to repurchase all or a portion of the assets under certain conditions, and royalty payments ("Contingent Consideration") based on commercial sales of avionics systems developed from or utilizing the ACi technology and prototypes, and/or computer-based training and/or engine control products.

24.     The base cash consideration for the APA totaled three million dollars ($3,000,000.00) and payment was to be provided in the following manner:  (1) seven-hundred-fifty-thousand dollars ($750,000.00) cash consideration paid upon closing of the contract; (2) seven-hundred-fifty-thousand dollars ($750,000.00) due upon ACi's completion of two operational prototypes; (3) seven-hundred-fifty-thousand dollars ($750,000.00) due upon BFGoodrich obtaining a contract or purchase order from a major original aircraft equipment manufacturer for an electronic flight instrumentation system that utilizes ACi's technology; and (4) seven-hundred-fifty-thousand dollars ($750,000.00) due upon BFGoodrich obtaining certification for an avionics system utilizing the ACi technology and prototypes.

25.     The first three landmark payments are not in dispute.  These landmarks were met and BFGoodrich paid the required compensation in accordance with the APA.

26.     Subsection (b) of Article 1.4, entitled "Purchase Price," discusses payment under the Agreement based on these above-described landmarks.  BFGoodrich having made the first three landmark payments, only Article 1.4(b)(iv) is at issue, which provides that ACi is owed the final landmark payment of seven-hundred-fifty-thousand dollars ($750,000.00) upon BFGoodrich obtaining certification for an avionics system utilizing the ACi technology and prototypes.

27.     In addition to the landmark payments comprising the base consideration of three million dollars ($3,000,000.00), Article 1.4(a)(ii) provides for additional consideration of up to four million dollars ($4,000,000.00) (the "Contingent Consideration") upon the achievement of certain avionics systems product sales and/or computer-based training sales and/or engine control product sales.  Pursuant to the

APA, the Contingent Consideration shall be earned and distributed according to the terms and conditions set forth in Exhibit A, which provides, in relevant part:

> Buyer [BFGoodrich] shall pay Seller [ACi] as additional contingent consideration, four percent (4%) of the gross annual (i) electronic flight instrumentation system product sales utilizing the Seller's integrated cockpit technology, (ii) training sales utilizing the Seller's integrated cockpit technology and (iii) engine control product sales utilizing the Seller's engine data acquisition and control system technology up to an aggregate maximum of $4,000,000 . . ., "gross sales" means the total sales of Buyer less any credits and allowances.

28.    Moreover, because of the unique and revolutionary nature of the OASIS prototype and technology, ACi bargained for a right of first refusal that would provide ACi with the opportunity to retain its property, technology, design, architecture, and assets in the event that BFGoodrich were to sell, transfer, convey, assign or take any other measures to dispose of the technology, architecture, design, or assets sold in the APA.  The Right of First Refusal was included at Article 6.2 of the APA and provides:

> Buyer shall not sell, transfer, assign or convey all or any part of the electronic flight instrumentation system technology acquired from Seller to any Person (the "Purchaser"), other than a transfer or assignment to an Affiliate of Buyer, which Affiliate shall assume Buyer's obligations under this Agreement and pay to Seller the Cash Consideration and Contingent Consideration on the same basis as would Buyer hereunder, without the prior written consent of Seller (or its successors in interest), or, in the absence of such consent, without first giving to Seller at least 30 days' written notice of Buyer's intention to dispose of such technology and the terms and conditions of such proposed disposition.  Within such 30 day period, such technology shall be offered for sale to and shall be subject to an option to purchase on the part of Seller, which option shall be exercised, if at all, within such 30 days.  The purchase by Seller shall be at the price and upon the terms and conditions stated in Buyer's notice.   In the event Seller elects not to exercise its option, Buyer shall be free to dispose of such technology; provided that Buyer shall remain obligated to pay Seller the Cash Consideration and the Contingent Consideration.  The Cash Consideration is payable as provided in Section 1.4(b) hereof as and when such conditions of payment have been satisfied.  For purposes of calculating the Contingent Consideration any contract or agreement for the sale of products described in paragraph 1 of Exhibit A in effect with

Buyer as of the date of the sale of such technology shall be deemed to be completed and satisfied in accordance with the terms of such contract or agreement.

29.     The APA was drafted with the purpose of ensuring that Plaintiff would be able to protect its economic interest in the technology by retaining the right to reclaim its prototype technology, design, architecture or other assets conveyed by the APA, or, in the event that it chose not to exercise its right of first refusal, ACi was entitled to four percent (4%) of any sales from any electronic flight instrumentation system utilizing the ACi technology and/or computer-based training utilizing such technology and/or engine control products utilizing ACi's engine data acquisition and control system technology.

30.     The APA further required that the ACi principals sign employment contracts with BFGoodrich, which required them to take reductions in pay, and continue to develop the patentable technology and prototypes and not compete with BFGoodrich for a period of two years after their employment contracts with BFGoodrich expired.

### *Facts Subsequent To The APA*

31.     Just prior to signing the APA, BFGoodrich began marketing the OASIS prototype and technology as "SmartDeck."  On July 26, 2000, two days prior to signing the APA, BFGoodrich announced that "[t]he combination of BFGoodrich's SmartDeck technologies with ACi's innovative developments will offer pilots a revolutionary new concept in flight.  ACi personnel have been involved in advanced cockpit development for the Department of Defense since the early 1970s.  ACi has been an active member of AGATE (Advanced General Aviation Transport Experiment) since 1996 and was elected to the Executive Council of AGATE in 1998, 1999, and 2000 directing AGATE activities.  In addition, ACi introduced the Onboard Avionics Synergistic Information

System (OASIS) concept in 1996, which combines disciplines developed for modern jet fighters with state-of-the-art personal computer technology for improved safety and reliability.  OASIS was demonstrated last year at EAA's Oshkosh AirVenture '99." Goodrich Corp., *BFGoodrich Aerospace Launces SmartDeck(TM) Avionics Suite for General Aviation and Business Jet Market*, GOODRICH CORP. PRESS RELEASE (July 26, 2000).

33.    In or around July of 2000, concurrent with the signing of the APA, BFGoodrich announced and unveiled the SmartDeck system at the EAA AirVenture Oshkosh Airshow in Oshkosh, Wisconsin.

33.    After signing the APA, BFGoodrich made the initial landmark payment of seven-hundred-fifty-thousand dollars ($750,000.00) that was due upon closing of the contract and the second landmark payment of seven-hundred-fifty-thousand dollars ($750,000.00) when ACi completed two operational prototypes.  Shortly thereafter and in accordance with Article 9.6 of the APA, ACi assigned its rights and obligations under the APA to DXE Corp., and subsequently to DXE.

34.    Later that year, in or around October 2000, BFGoodrich installed the SmartDeck system prototype developed by ACi in a Beech King Air C90, one of BFGoodrich's aircrafts, and unveiled it at the National Business Aviation Association Show in New Orleans, Louisiana.  Utilizing the ACi prototypes, BFGoodrich promoted the SmartDeck's unique attributes and pilot-friendly characteristics as follows:  "Whether experiencing SmartDeck at NBAA or in its King Air, attendees can witness its unique Synthetic Vision (SV) with Highway-In-The-Sky (HITS) overlay depictions.   The SV/HITS depiction is designed to fulfill aviation's free flight vision, making instrument

flying more intuitive and therefore more accessible to a wider range of pilots. The BFGoodrich SV/HITS Implementation makes use of a 3D perspective 'out-the-window' view; pathway navigation overlay derived from the active flight plan; and a predictor function that estimates the aircraft's three-dimensional path." Goodrich Corp., *SmartDeck (TM) Takes Flight on BFGoodrich's King Air C90*, GOODRICH CORP. PRESS RELEASE (Oct. 09, 2000).

35.     In or around December 2000, BFGoodrich entered into a contract for the sale of SmartDeck systems to Piper Aircraft, Inc., one of the world's "Big Three" original equipment manufacturers of general aviation aircraft, triggering the third landmark payment of seven-hundred-fifty-thousand dollars ($750,000.00), which BFGoodrich paid in accordance with the terms of the APA.

36.     The following year, in or around July 2001, BFGoodrich again presented the SmartDeck system at the EAA AirVenture Oshkosh Airshow in Oshkosh, Wisconsin, this time in both the BFGoodrich and NASA hangers, and permitted attendees to operate the SmartDeck in real-world conditions experiencing synthetic vision and Highway-In-The-Sky technology using the operational prototypes, all of which was based on and utilized the technology, architecture, design, and assets transferred through the APA. Goodrich Corp., *SmartDeck (TM) Simulator to Be Featured at Goodrich And NASA Booths During AirVenture*, GOODRICH CORP. PRESS RELEASE (July 24, 2001).

37.     In or around July 2001, provisional patent applications authored by Cliff Brust and Gary Evans, former ACi principals, were submitted to the United States Patent Office. These patents were based on proprietary ACi technology that was

transferred to BFGoodrich as part of the APA, which, upon information and belief, were incorporated into SmartDeck.

38.     Plaintiff is informed and believes and thereon alleges that in or around February 2001, BFGoodrich entered into a contract with Williams International for the development and sale of a revised engine controller that utilized ACi's engine data acquisition and control system technology.

39.     Plaintiff is informed and believes and thereon alleges that in or around 2003, Defendants acquired all or substantially all of BFGoodrich's assets and liabilities, including the obligations under the APA.

40.     Defendants continued to develop SmartDeck into a FAA certified and commercially successful product; yet, at all times relevant to this action, the SmartDeck remained based on and utilized the technology and design concepts of the OASIS electronic flight instrumentation system and prototype that was sold to BFGoodrich pursuant to the APA.  Indeed, the SmartDeck manufactured and sold by Defendants retained the same visual characteristics as the OASIS prototype and retained its primary functions, including, but not necessarily limited to, the Highway-In-The-Sky and Synthetic Vision technology, as well as its human factors characteristics such as the shallow menu display.

41.     Plaintiff is informed and believes and thereon alleges that Defendants, in or around December 2007, entered into a purchase agreement with Cirrus Design Corporation, a Minnesota-based original equipment manufacturer of general aviation aircraft ("Cirrus"), for the purchase and distribution of the SmartDeck system under which Defendants would be the sole supplier of glass cockpit technology for the Cirrus

SR22 and SR22 G2 aircraft and whereby Cirrus agreed to buy approximately 350 SmartDeck systems. Moreover, upon information and belief, the terms of the purchase agreement provided Defendants with the opportunity to sell SmartDeck operating and computer-based training software to Cirrus's customers. Defendants' transactions with Cirrus for the sale of the SmartDeck systems and computer-based training software triggered the Contingent Consideration provision of the APA entitling Plaintiff to 4% of the gross annual sales of the SmartDeck system through 2010.

42.     On or around May 21, 2008, Defendants received Technical Standard Order Authorization and Supplemental Type Certification from the FAA for the SmartDeck. The Supplemental Type Certificate was awarded for the Cirrus model SR22 and SR22 G2 aircrafts for both original equipment and retrofit applications. During the relevant period, sales of the SR22 and SR22 G2 aircraft represented a significant percentage of all new general aviation aircraft sold. Additionally, aftermarket sales of the SR22 and SR22 G2 were comparable to or greater than those of an aircraft subject to an OEM award. By obtaining a Supplemental Type Certificate for the SmartDeck for either the Cirrus SR22 or SR22 G2 model aircrafts, the final landmark payment was triggered entitling Plaintiff to payment of seven-hundred-fifty-thousand dollars ($750,000.00) under Article 1.4(b)(iv) of the APA.

43.     Plaintiff is informed and believes and thereon alleges that in or around August 2008, Defendants entered into an additional purchase agreement with Cirrus for approximately 75 SmartDeck systems. Defendants' transaction with Cirrus triggered the contingent consideration provision of the APA entitling Plaintiff to 4% of the gross annual sales of the SmartDeck system through 2010.

44.     Plaintiff is informed and believes and thereon alleges that in or around October 2008, Defendants introduced computer-based training for flying and operating the SmartDeck permitting pilots to familiarize themselves with and transition to flying the SmartDeck, which Defendants sold to Cirrus and other customers.  This event triggered the Contingent Consideration of Article 1.4(a)(ii), entitling Plaintiff to 4% of any sales of such computer-based training through 2010.

45.     Plaintiff is informed and believes and thereon alleges that in or around October 2010, Defendants announced that they had entered into an agreement with Esterline CMC Electronics, a subsidiary of Esterline Corporation ("CMC"), whereby the entire SmartDeck system, including its underlying technology, design, and architecture, was sold, assigned, transferred, or conveyed to CMC as either a sale or exclusive licensing agreement under which CMC was granted the right to market, sell, and exploit the SmartDeck system, exclude others from marketing the SmartDeck system in the aviation market, as well as label and refer to the SmartDeck system as its own, which it currently does through an extensive marketing campaign.

46.     Defendants' conveying, assigning, transferring, selling, or licensing the SmartDeck system and underlying technology has the substantive effect of transferring property rights irrespective of legal title as no substantial right has been retained by Defendants in the aviation market.

47.     Defendants' transaction with CMC triggered Article 6.2's Right of First Refusal and/or Article 1.4(a)(ii)'s Contingent Consideration provision, or both.

48.     Defendants never informed Plaintiff of their transaction with CMC, and thus, have denied Plaintiff the opportunity to exercise its right of first refusal and have further refused to pay Plaintiff the Contingent Consideration.

49.     Plaintiff is informed and believes and thereon alleges that the SmartDeck integrated cockpit system announced and unveiled by CMC at the 2011 National Business Aviation Association airshow is based upon the prototype technology and design obtained from ACi and contains several notable and distinctive features of the OASIS, including, but not limited to, synthetic vision, Highway-In-The-Sky technology, dual monitor displays, a "glass cockpit" with easy-to-use interface and shallow menu display, moving map topography, and the displaying of recent engine history through separate trend graphs showing the prior ten minutes of data for oil pressure, oil temperature, and RPM.

### COUNT I
### (Breach of Contract For Defendants' Refusal To Make The Final Landmark Payment)

50.     Plaintiff incorporates by reference the allegations contained in each and every preceding paragraph of the Complaint as though fully set forth herein.

51.     At all times relevant, Plaintiff performed or was performing all applicable terms of the APA.

52.     Pursuant to Article 1.4(b)(iv) of the APA, a landmark payment of seven-hundred-fifty-thousand dollars ($750,000.00) was to be paid "upon either (A) the first certification of an EFIS that utilizes the Seller's cockpit technology via 'Type Certificate,' 'Amended Type Certificate,' or 'Supplemental Type Certificate' received with respect to an airframe which is the subject of an OEM Award," or "(B) a 'Supplemental Type

Certificate' for an EFIS that utilizes the Seller's cockpit technology in the aftermarket and the achievement of aggregate sales which would be comparable to those which would be the subject of an OEM Award as mutually agreed to by the Buyer and Seller."

53.    On or around May 21, 2008, Defendants received Technical Standard Order Authorization and Supplemental Type Certification from the FAA for the SmartDeck.  The Supplemental Type Certificate was awarded for the Cirrus model SR22 and SR22 G2 aircrafts for both original equipment and retrofit applications. During the relevant period, sales of the SR22 and SR22 G2 aircraft represented a significant percentage of all new general aviation aircraft sold.  Additionally, aftermarket sales of the SR22 and SR22 G2 were comparable to or greater than those of an aircraft subject to an OEM award.  By obtaining a Supplemental Type Certificate for the SmartDeck for either the Cirrus SR22 or SR22 G2 model aircrafts, the final landmark payment was triggered entitling Plaintiff to payment of seven-hundred-fifty-thousand dollars ($750,000.00) under Article 1.4(b)(iv) of the APA.

54.    Defendants breached the APA by unilaterally refusing Plaintiff's requests for the final landmark payment.

55.    Further, in all contracts there is an implied covenant of good faith and fair dealing that no party will do anything that will have the effect of impairing, destroying, and/or injuring the rights of the other party to receive the benefits of their agreement. As alleged herein, Defendants engaged in objectively unreasonable behavior and breached the covenant of good faith and fair dealing.

56.    As a direct and proximate result of Defendants' breach of the APA, Plaintiff has suffered monetary damages in an amount not less than seven-hundred-

fifty-thousand dollars ($750,000.00), exclusive of interest and the costs of pursuing this matter.

  **WHEREFORE,** Plaintiff DXE respectfully requests that the Court:

   a. Award general, specific, consequential, and incidental damages in an amount not less than seven-hundred-fifty-thousand dollars ($750,000.00) for Defendants' bad faith failure to provide Plaintiff with the final landmark payment as required under the APA;

   b. Award Plaintiff the interest, costs, expenses, and attorneys' fees of this litigation; and

   c. Award Plaintiff any other appropriate relief to which Plaintiff is entitled and/or this Court deems equitable.

**COUNT II**
**(Breach of Right of First Refusal)**

  57. Plaintiff incorporates by reference the allegations contained in each and every preceding paragraph of the Complaint as though fully set forth herein.

  58. Article 6.2 of the APA provides Plaintiff with a preemptive right of first refusal that is sufficiently specific to be enforceable between Plaintiff and Defendants.

  59. Article 6.2 of the APA places an affirmative duty on Defendants to provide Plaintiff with a written offer to match any offer to sell, transfer, assign, or convey all or any portion of the prototype technology, design, architecture, or other assets conveyed by the APA to a third party at the price and conditions as those offered by Defendants in its notice for a period of thirty (30) days.

20

60.　　Defendants' sale and/or exclusive licensing of the SmartDeck electronic flight instrumentation system to CMC, which has the substantive effect of a sale, is a sale, transfer, assignment, or conveyance sufficient to trigger Article 6.2's Right of First Refusal.

61.　　Plaintiff's preemptive right ripened into a bona option upon CMC's offer to purchase and/or license the SmartDeck system, creating an affirmative obligation on Defendants to make a written offer to Plaintiff to reclaim its legal rights to the prototype technology, design, architecture, property, and assets conveyed in the APA.

62.　　Defendants did not notify Plaintiff of the negotiations or offer from CMC and did not make a written offer to Plaintiff.

63.　　On or about October 2010, Plaintiff discovered for the first time that Defendants had conveyed the assets subject to the APA, including the prototype technology, to CMC.

64.　　Had Plaintiff been given written notice of Defendants' intent to sell, assign, transfer, or convey the subject property, design, architecture, and technology, Plaintiff would have exercised its right of first refusal and taken possession of its legal property rights to the OASIS prototype technology, design, architecture, and other assets transferred under the APA.

65.　　Defendants' failure to provide written notice to Plaintiff of the sale, assignment, transfer, or conveyance of the subject assets and property rights constituted a breach of Article 6.2 of the APA resulting in harm to Plaintiff.

66.　　As a direct and proximate result of Defendants' breach, Plaintiff has been denied its bargained for consideration under the APA, denied the valuable property

rights to its technology, and has suffered substantial economic damages in an amount to be proven at trial.

> **WHEREFORE**, Plaintiff DXE is entitled to the alternative remedies of:

> a.   An award of general, specific, consequential, and incidental damages in an amount sufficient to compensate Plaintiff for the harm or loss of economic benefit it suffered according to proof at trial for Defendants' bad faith failure to notify Plaintiff of the pending agreement with CMC and bad faith failure to offer Plaintiff its contractual right of first refusal; or

> b.   An order of specific performance against Defendants requiring Defendants to transfer to Plaintiff those certain property rights, designs, architecture, and assets obtained from Plaintiff through the APA; and

> c.   Award Plaintiff costs, interest, expenses, and attorneys' fees; and

> d.   Award any such other relief to which Plaintiff is entitled and/or this Court deems equitable.

## COUNT III
## (Breach of Contingent Consideration Provision)

67.   Plaintiff incorporates by reference the allegations contained in each and every preceding paragraph of the Complaint as though fully set forth herein.

68.   At all times relevant, Plaintiff performed or was performing all applicable terms of the APA.

69.    On or around February 2001, BFGoodrich entered into a purchase agreement with Williams International whereby BFGoodrich modified the design and sold engine controllers, which utilized ACi's engine data acquisition and control system technology, to Williams International.  Plaintiff is entitled to four percent (4%) of the gross annual sales of these engine controllers as part of the Contingent Consideration pursuant to Article 1.4(a)(ii) of the APA.

70.    On or around December 2007, Defendants entered into a purchase agreement with Cirrus Design Corporation whereby Defendants would sell and distribute SmartDeck systems to Cirrus.  The purchase agreement between Defendants and Cirrus constitutes "electronic flight instrumentation system product sales utilizing the Seller's integrated cockpit technology" under the APA.  Pursuant to Article 1.4(a)(ii), Plaintiff is entitled to four percent (4%) of Defendants' gross annual sales of SmartDeck through 2010.

71.    In or around 2008, Defendants introduced and thereafter began selling computer-based training technology for operating the SmartDeck, which constitutes training sales utilizing ACi's integrated cockpit technology entitling Plaintiff, pursuant to Article 1.4(a)(ii) of the APA, to four percent (4%) of the gross annual sales for such computer-based training through 2010.

72.    Plaintiff is informed and believes and thereon alleges that in or around 2009, Defendants entered into an agreement with CMC that had the substantive effect of transferring property rights in the SmartDeck electronic flight instrumentation system, including the exclusive right to market, exploit, sell, and distribute the SmartDeck system, label and refer to the system as its own, which CMC does through an extensive

marketing campaign, and exclude others from exploiting, marketing, and selling the SmartDeck system in the aviation market, which at all times relevant to this action was based on and utilized ACi's technology, design, and architecture.  The transaction between Defendants and CMC constitutes "electronic flight instrumentation system product sales utilizing the Seller's integrated cockpit technology" under the APA. Pursuant to Article 1.4(a)(ii), Plaintiff is entitled to four percent (4%) of Defendants' gross annual sales under this agreement or four percent (4%) of the revenue resulting from this transaction and received by Defendants through 2010.

73.    Plaintiff is informed and believes and thereon alleges that in addition to the Cirrus and CMC sales, Defendants have sold numerous SmartDeck systems and computer-based training during the relevant periods, entitling Plaintiff to four-percent (4%) of the gross annual sales through 2010 pursuant to Article 1.4(a)(ii) of the APA.

74.    Defendants breached the APA by unilaterally refusing to provide Plaintiff with the Contingent Consideration related to these transactions.

75.    Further, in all contracts there is an implied covenant of good faith and fair dealing that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement.  As alleged herein, Defendants engaged in objectively unreasonable behavior and breached the covenant of good faith and fair dealing.

76.    As a direct and proximate result of Defendants' breach, Plaintiff has been denied its bargained for consideration under the APA and has suffered substantial monetary harm in an amount to be proven at trial.

**WHEREFORE**, Plaintiff DXE respectfully requests that the Court:

a.  Award Plaintiff monetary damages in an amount of not less than four percent (4%) of Defendants' gross annual sales of SmartDeck through 2010;

b.  Award Plaintiff monetary damages in an amount of not less than four percent (4%) of Defendants' gross annual sales of SmartDeck computer-based training through 2010;

c.  Award Plaintiff monetary damages in an amount of not less than 4% of the gross annual sales of engine controllers through 2010;

d.  Award Plaintiff costs, interest, attorneys' fees, and expenses; and

e.  Award any such other relief to which Plaintiff is entitled and/or this Court deems equitable.

## JURY DEMAND

Plaintiff DXE Corporation Liquidating Trust respectfully requests a trial by jury on all issues triable thereby.

Dated this 30th of March 2012.

s/ Stuart E. Scott
_____
STUART E. SCOTT  (0064834)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (FAX)
*sscott@spanglaw.com*

***Counsel for Plaintiff***